Audra SOMMERS, Appellant,

v.

IOWA CIVIL RIGHTS COMMISSION,
Appellee.

No. 68164.

Supreme Court of Iowa.

May 18, 1983.

As Amended Sept. 2, 1983.

Linda S. Pettit and Anthony J. Touschner, Des Moines, for appellant.

Thomas J. Miller, Atty. Gen., and Scott H. Nichols, Asst. Atty. Gen., for appellee.

Considered by HARRIS, P.J., and McCORMICK, McGIVERIN, LARSON, and SCHULTZ, JJ.

SCHULTZ, Justice.

In this appeal we are asked to determine whether Iowa Code section 601A.6(1)(a) proscribes employment discrimination based on transsexuality. Petitioner, Audra Sommers, filed two complaints with the Iowa Civil Rights Commission (commission) alleging that she had been discharged because of her transsexual condition. The commission dismissed both complaints for lack of jurisdiction and Sommers appeals from these dismissals. We find no error. Accordingly, we affirm.

Sommers, who is referred to as "she" in accordance with her request, claims to be an individual who is "anatomically male but psychologically and emotionally female" and who has been pursuing a prescribed sexual reassignment treatment. On April 22, 1980, she was hired by Budget Marketing, Inc. to do clerical work. She dressed as a female during her employment and worked for three days without complaint about her job performance. On April 24 she was recognized by an old acquaintance who also worked at Budget Marketing. She was questioned about her sexual status and on August 25 she was told she could not use the restrooms and she was discharged.

Sommers filed a complaint with the Iowa Civil Rights Commission alleging sex discrimination in violation of the Iowa Civil

Rights Act, Iowa Code ch. 601A (1981). The commission determined that her complaint was beyond the scope of its jurisdiction and dismissed it. Sommers subsequently filed another complaint alleging she was discriminated against on the basis of a disability, also in violation of chapter 601A. The commission informed her that her file had been closed due to lack of jurisdiction. On judicial review the Polk County District Court, Richard Strickler, J., affirmed the commission's decision. This appeal followed.

■■■ The Iowa Civil Rights Commission is an administrative agency governed by the provisions of the Iowa Administrative Procedure Act. Iowa Code § 17A.2 (1981). The act provides judicial review of final agency action. Iowa Code § 17A.19(1); *see also* Iowa Code § 601A.17(1) (1981). The commission by its own rule provides "no jurisdiction shall mean that the alleged discriminatory act or practice is not one that is prohibited by the Iowa Civil Rights Act . . . ." 240 I.A.C. § 1.1(6)(e). A ruling that the agency has no jurisdiction is a final action of the commission for purposes of judicial review. Iowa Code § 17A.2(1); 240 I.A.C. § 1.1(6)(e). Section 17A.19 provides the exclusive means of judicial review of the agency's action by the district court. *Northbrook Residents Association v. Iowa State Department of Health, etc.,* 298 N.W.2d 330, 331 (Iowa 1980). On appeal this court may review a final action of the district court. Iowa Code § 17A.20 (1981). Section 17A.20 provides:

An aggrieved or adversely affected party to the judicial review proceeding may obtain a review of any final judgment of the district court under this chapter by appeal to the supreme court. The appeal shall be taken as in other civil cases, although the appeal may be taken regardless of the amount involved.

In other civil cases the court's duty is to correct errors of law made by the district court and that is our duty here. *Foods, Inc. v. Iowa Civil Rights Commission,* 318 N.W.2d 162, 164–65 (Iowa 1982). To determine whether the district court correctly applied the law, we apply the standards of section 17A.19(8) to the commission's actions to determine whether our conclusions are the same as those of the district court. *Foods, Inc.,* 318 N.W.2d at 165.

On this appeal we are not examining civil liberties protected by the Constitution, but civil rights which are enforceable claims rooted in the Iowa Civil Rights Act. *Estabrook v. Iowa Civil Rights Commission,* 283 N.W.2d 306, 309 (Iowa 1979). Iowa Code section 601A.6 (1981) provides: "1. It shall be an unfair and discriminatory practice for any: a. Person to . . . discharge any employee . . . because of age, race, creed, color, sex, national origin, religion or disability of such . . . employee . . . ." In this appeal we are particularly concerned with the construction of the terms "sex" and "disability" as they are used in section 601A.6(1)(a). The commission construed the statutory language to exclude an action for discrimination on the basis of transsexuality.

■■■ In reviewing the commission's interpretation of statutory provisions we may give deference to, but are not bound by, the commission's interpretation. *American Home Products Corp. v. Iowa State Board of Tax Review,* 302 N.W.2d 140, 142 (Iowa 1981). The ultimate interpretation of Iowa statutory law is the province of the supreme court. *Id.*

We have been asked previously to interpret provisions of the Iowa Civil Rights Act. *See, e.g., Foods, Inc.,* 318 N.W.2d 162; *Estabrook,* 283 N.W.2d 306; *Franklin Manufacturing Co. v. Iowa Civil Rights Commission,* 270 N.W.2d 829 (Iowa 1978); *Cedar Rapids Community School District v. Parr,* 227 N.W.2d 486 (Iowa 1975); *Iron Workers Local No. 67 v. Hart,* 191 N.W.2d 758 (Iowa 1971). In *Franklin Manufacturing Co.,* we listed a number of well-established rules of statutory construction:

(1) In considering legislative enactments we should avoid strained, impractical or absurd results.

(2) Ordinarily, the usual and ordinary meaning is to be given the language used but the manifest intent of the legislature

will prevail over the literal import of the words used.

(3) Where language is clear and plain, there is no room for construction.

(4) We should look to the object to be accomplished and the evils and mischiefs sought to be remedied in reaching a reasonable or liberal construction which will best effect its purpose rather than one which will defeat it.

(5) All parts of the enactment should be considered together and undue importance should not be given to any single or isolated portion.

(6) We give weight to the administrative interpretation of statutes, particularly when they are of longstanding.

*Franklin Manufacturing Co.,* 270 N.W.2d at 831–32 (citations omitted).

The purpose of the Iowa Civil Rights Act is "to eliminate unfair and discriminatory practices in public accommodations, employment, apprenticeship programs, on-the-job programs and vocational schools and to permit the study of discrimination in housing." 1965 Iowa Acts ch. 121 (1965). The Iowa Civil Rights Act should be construed liberally to effect its purpose. Iowa Code § 601A.18 (1981); *Franklin Manufacturing Co.,* 270 N.W.2d at 832.

We will be mindful of these rules and the purpose of the Iowa Civil Rights Act as we determine whether Sommers is provided a remedy as a matter of law by section 601A.6(1)(a).

We must begin with a general discussion of transsexualism. It is useful to distinguish between the terms "sex" and "gender"; sex "connotes the anatomical qualities that determine whether one is male or female, while gender relates to behavior, feelings, and thoughts and does not always correlate with one's physiological status." *Doe v. Minnesota Department of Public Welfare and Hennepin County Welfare Board,* 257 N.W.2d 816, 818 (Minn.1977). In cases where sex and gender develop independently, the result is a person with a serious problem of gender disorientation. This problem often begins early in life and

may be due to medical, in addition to psychological, disturbances. *Id.*

Transsexualism differs from homosexuality or transvestism. Homosexuals do not suffer from gender identity disturbances as do transsexuals and transvestites. Homosexuals accept their anatomical structure and the male or female role, except with regard to sexual preference. A transvestite represents a status between the homosexual and the transsexual and obtains satisfaction by dressing or masquerading in clothing of the opposite sex. *Id.*

It is generally agreed that transsexualism is irreversible and can only be treated with surgery to remove some of the transsexual feelings of psychological distress; psychotherapy is ineffective. Generally, the surgery involves sexual reassignment which involves removing the male sex organs and constructing female sex organs. It apparently has proven psychological, but not physical, benefits for its recipients. *Id.; Pinneke v. Preisser,* 623 F.2d 546, 548–49 (8th Cir.1980).

Sommers was pursuing a prescribed sexual reassignment through hormone treatment, psychological counseling, and was planning to have sexual reassignment surgery at the time of her termination.

I. *Sex.* The district court, after noting that "sex" is not defined in chapter 601A, ruled that "sex" must be construed according to its common usage. It found that the common usage of the word sex denotes male *or* female, but not both. Moreover, it iterated that the legislature did not provide for transsexuals as a class to be protected by chapter 601A. Nor did it find any evidence of legislative intent to expand the traditional meaning of sex to include transsexuals. Accordingly, the commission was found to be not unreasonable, arbitrary, or capricious in denying jurisdiction.

Sommers contends that transsexualism has all the characteristics of the other impermissible classifications included in section 601A.6(1)(a) (age, race, creed, color, religion, sex, national origin, and disability). She also contends that because the legislature prohibited discrimination based on

"sex," rather than on "male or female sex," it left open the possibility of prohibiting discrimination against persons with attributes of both sexes. We disagree.

■ First, the Iowa Civil Rights Act does not expressly include transsexuals as a protected class. Thus, even if transsexuals possess the same characteristics as the protected classes, it is for the legislature by statute and not for this court by judicial fiat to provide relief.

■ Last, we find that by proscribing discrimination on account of sex the legislature did not intend that the term would include transsexuals. A purpose of section 601A.6(1)(a) is to make unlawful discrimination on the basis of sex. 1970 Iowa Acts ch. 1058. We agree with Sommers that the legislature did not consider transsexuals in adding sex as a protected class. As Sommers admits, the legislature's primary concern was a desire to place women on an equal footing with men in the workplace. We also believe that the legislature's purpose in banning discrimination based on sex was to prohibit conduct which, had the victim been a member of the opposite sex, would not have otherwise occurred. *See Voyles v. Ralph K. Davies Medical Center,* 403 F.Supp. 456 (N.D.Cal.1975), aff'd. without opinion, 570 F.2d 354 (9th Cir.1978) (examining Title VII of the federal Civil Rights Act). Accordingly, we find Sommers' argument to be unpersuasive.

■ This is a case of first impression in Iowa. Several federal courts have confronted this issue in connection with Title VII of the Civil Rights Act of 1964. Each court has found that transsexualism is not protected by Title VII's prohibition of discrimination based on "sex." *Sommers v. Budget Marketing, Inc.,* 667 F.2d 748 (8th Cir.1982); *Holloway v. Arthur Anderson & Co.,* 566 F.2d 659 (9th Cir.1977); *Powell v. Read's, Inc.,* 436 F.Supp. 369 (D.Md.1977); *Voyles,* 403 F.Supp. 456. *Contra Ulane v. Eastern Airlines, Inc.,* 28 F.E.P. 1438 (N.D. Ill.1982). Although we are not bound by federal decisions in construing the Iowa Civil Rights Act, *Franklin Manufacturing Co.,* 270 N.W.2d at 831, we find these deci-

sions, combined with the paucity of conflicting evidence, and the deference to be given the commission's decision, *see American Home Products Corp.,* 302 N.W.2d at 142, to be persuasive. *See Iowa State Fairgrounds Security v. Iowa Civil Rights Commission,* 322 N.W.2d 293, 296 (Iowa 1982). Accordingly, we agree that the commission's determination that it did not have jurisdiction to hear Sommer's complaint was not unreasonable, arbitrary, or capricious.

■ II. *Disability.* Sommers claims that the commission erred in dismissing her complaint of employment discrimination based on disability. Accordingly, she contends that the district court erred in giving deference to the commission's finding of "no jurisdiction" and in ruling that the finding was not arbitrary, capricious, or unreasonable. We hold that in the context of employment transsexualism is not a disability and we affirm.

The Iowa Civil Rights Act was amended in 1972 to "extend the rights of employment, accommodations, and services as provided in the Iowa Civil Rights Act to physically and mentally disabled persons." 1972 Iowa Acts ch. 1031. Thus, section 601A.6(1)(a) prohibits discrimination in employment because of the disability of an employee, "unless based upon the nature of the occupation." For the purposes of chapter 601A the legislature defined "disability" as follows:

... the physical or mental condition of a person which constitutes a substantial handicap. In reference to employment, under this chapter, "disability" also means the physical or mental condition of a person which constitutes a substantial handicap, but is unrelated to such person's ability to engage in a particular occupation.

Iowa Code § 601A.2(11). The legislature did not provide a definition of "substantial handicap," however, and this definition is itself open to interpretation.

The commission subsequently adopted rules which define a "substantially handicapped person" and which also define terms contained in that definition. These rules provide as follows:

(1) The term *"substantially handicapped person"* shall mean any person who has a physical or mental impairment which substantially limits one or more major life activities, has a record of such an impairment, or is regarded as having such an impairment.

(2) The term *"physical or mental impairment"* means:

a. Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: Neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive; digestive; genitourinary; hemic and lymphatic; skin; and endocrine; or

b. Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

(3) The term *"major life activities"* means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

(4) The term *"has a record of such an impairment"* means has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities.

(5) The term *"is regarded as having an impairment"* means:

a. Has a physical or mental impairment that does not substantially limit major life activities but that is perceived as constituting such a limitation;

b. Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or

c. Has none of the impairments defined to be "physical or mental impairments," but is perceived as having such an impairment.

240 I.A.C. 6.1(1)–(5) (1982).

Sommers contends that these rules must be interpreted to classify her as disabled. Accordingly, she argues that the commission failed to apply these rules correctly. Sommers argues that transsexualism is an involuntary mental and physical impairment that substantially limits her ability to obtain and retain employment. She contends that even if the court rejects that argument, she is still "substantially handicapped" because she is "regarded as having such an impairment."

We do not give weight to an agency's interpretation of its rules if that interpretation is plainly inconsistent with those rules. *Bowles v. Seminole Rock Co.,* 325 U.S. 410, 413–14, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945). Accordingly, if the interpretation is inconsistent with the rules, and the rules are valid, then we would give no deference to the interpretation, but would give the rule itself the force and effect of law. *Davenport Community School District v. Iowa Civil Rights Commission,* 277 N.W.2d 907, 909 (Iowa 1979). A rule is not valid, however, if it violates any of the seven criteria of section 17A.19(8). *Hiserote Homes, Inc. v. Riedemann,* 277 N.W.2d 911, 912 (Iowa 1979). The agency action in promulgating a rule may not exceed its statutory authority. Iowa Code § 17A.19(8)(b). Although section 601A.5(10) grants the commission authority to "adopt, publish, amend and rescind regulations consistent with and necessary for the enforcement" of chapter 601A, the rules are not enforceable if they are beyond the scope of the delegation. *Davenport Community School District,* 277 N.W.2d at 909. The rules would be beyond the scope of the delegation if they are at variance with the enabling act or if they amend or nullify legislative intent. *Hiserote Homes, Inc.,* 277 N.W.2d at 913; *Schmitt v. Iowa Department of Social Services,* 263 N.W.2d 739, 745 (Iowa 1978); *Iowa Department of Revenue v. Iowa Merit Employment Commission,* 243 N.W.2d 610, 616 (Iowa 1976). Thus, even though we will hold that a rule is within the agency's power if a rational agency could so conclude, *Davenport Community School District,* 277 N.W.2d at 910, the exercise of the agency's expert discretion is limited. *Hiserote Homes, Inc.,* 277 N.W.2d at 913. Accordingly, we must now determine whether the commission rules properly reflect legislative intent.

In defining "substantially handicapped person" in rule 6.1, the commission sought to implement the legislative definition of disability in section 601A.2(11) as "the physical or mental condition of a person which constitutes a substantial handicap." In doing so the commission was guided by the additional provision in section 601A.2(11) that in the employment context a disability would also embrace a physical or mental condition that constitutes a substantial handicap but does not affect the person's ability to engage in a particular occupation. A worker's epilepsy was found to constitute such a disability in *Foods, Inc. v. Iowa Civil Rights Commission,* 318 N.W.2d 162, 166–69 (Iowa 1982).

In its rule the commission equated the requisite handicapping condition with a physical or mental impairment "which substantially limits one or more major life activities." 240 I.A.C. 6.1(1) (1982). "A person has such a handicap in three circumstances: (1) if the person actually has the impairment, (2) has a record of such an impairment, or (3) is regarded as having such an impairment." *Id.*

The implementing rule defines both physical and mental impairment. Sommers claims she has a medical condition that has its roots in physical or mental factors. Because her claim lacks further specificity, we will examine the relevant portions of each definition.

The portion of the definition of "physical impairment" that is relevant here refers to a "physiological disorder or condition" or "anatomical loss." *Id.* 6.1(2)(a). This definition is confined to the characteristics of the body organs and whether such organs are normal and healthy. "Mental impairment" insofar as relevant here includes "[a]ny mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." *Id.* at 6.1(2)(b). Any impairment is substantial only if it substantially interferes with the person's ability to perform functions "such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Id.* at 6.1(3).

Sommers attacks the legality of the commission's interpretation of its rule rather than the validity of the rule. The commission does not question the validity of its rule and defends its interpretation. We need not pass on the validity of the rule, as we determine that the interpretation of the rule was not contrary to the statute or rule nor arbitrary, capricious or unreasonable.

Under the implementing rule a physical impairment relates to an organic disorder of the body. No claim is made that a transsexual has an abnormal or unhealthy body. The commission could reasonably conclude that under its rule Sommers had no physical impairment.

Further under the rule, a psychological disorder is a substantial handicap if it is a mental impairment "such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." 240 I.A.C. 6.1(2)(b). A person who is anatomically of one sex but psychologically and emotionally of the other sex obviously has a grave problem, but that problem does not necessarily constitute the kind of mental condition that the legislature intended be treated as a substantial handicap to employment under the statute. The commission could reasonably conclude that to be covered the disorder must fall into the class of psychological disorders delineated in the rule.

The delineated mental conditions are inherently likely to have a limiting effect on one or more major life activities. Transsexualism ordinarily should not affect a person's capacity to engage in those activities. Instead, transsexualism is more likely to have an adverse effect because of attitudes of others toward the condition. This does not mean, however, the condition meets the rule definition of impairment. The condition must independently come within the definition of impairment before attitudes of others can be said to make the condition a substantial handicap. Because transsexualism lacks the inherent propensity to limit major life activities of the listed examples of mental impairment, the commission could

reasonably conclude it is not a mental impairment under the statute or rule.

An adverse societal attitude does not mean that the transsexual is necessarily perceived as having a physical or mental impairment. Although a transsexual may have difficulty in obtaining and retaining employment, the commission could reasonably believe that difficulty is the result of discrimination based on societal beliefs that the transsexual is undesirable, rather than from beliefs that the transsexual is impaired physically or mentally as that term is used in the statute and defined in the rule. While we do not approve of such discrimination, we do not believe it is prohibited by the Iowa Civil Rights Act. The court is not a super-legislature, and we will not extend the provisions of the act.

We conclude that the commission did not err in interpreting the statute and rule in the respects alleged. Accordingly, we affirm.

AFFIRMED.